Good morning, Your Honors. Mitchell Posen for Mr. Mack. This is, I think, a pretty interesting situation, an unusual situation, but an important one that we have here, where the cases that I've cited, I think, admit of no particular exceptions in the case that the government has cited, likewise didn't necessarily foresee that they'd come into conflict with the cases that I've cited. Essentially, we have a situation where we have a constitutional right to a closing argument. And I'm focusing on that because I think that's our, you know, I've raised a number of issues here, but that's probably our strongest and most important and compelling. Can I state it briefly to see what your full position is? Let me just state it briefly and see if I'm right, okay? Okay. I take it your argument would be where a person is effectively removed as his own counsel and no other lawyers appointed in his place, where examination of witnesses is denied or truncated, where there is no allowance of closing argument. That isn't a trial, as we know a trial to be in the United States. And so this Court had better reverse it so that he can get a real, honest-to-goodness United States constitutional trial. That's your position? Yes, Your Honor. And if you are prepared to rule in my favor right on that basis, I could sit down and say nothing further. I think we're simply stating your position. I think that you've hit on the point. I wasn't saying we understand it. Yes. Your Honor, you've hit on what I perceive to be the reason why these two issues don't seem to have come into conflict previously, which is that the cases cited by the government involved a situation where a criminal defendant was bound, gagged, ejected or whatever, but where his attorney obviously was able to remain in the courtroom and continue to do whatever that attorney did. And here, of course, that was not the case. Does it make any difference that your client, Mr. Mack, repeatedly turned down offers by the Court to have counsel appointed? Well, I think there's a couple of them. A couple of things to respond to that. One is the — I believe that the Court has the authority to appoint counsel even over the objection of a defendant where it's clear that counsel is necessary. And I'd submit that in this case, counsel was necessary and was clearly necessary from the get-go. There are some statements at the very beginning where the judge says, from the get-go, Your Honor, you and I have been fighting. So I think it was clear to the judge — Went through how many lawyers before the trial started? Well, I believe, if you count himself, I'm probably the fifth lawyer. I think there were three prior to trial, him and then me. I don't think I would count him, but he went through three lawyers? He went through three previous lawyers. So there was obviously, if nothing else, that should have shown the district court that this was somebody who was going to have some issues at trial. Well, what difference does that make? I mean, once the issues develop badly enough to remove him, is there any case that says you can remove the defendant and not appoint another attorney somehow to represent his interests? I'm aware of no such case, Your Honor. And then I'd further say that there were less or remedies that were available to the district court at that point, short of what the district court did. Number one, the final outburst that resulted in his ejection, in Mr. Mack's ejection from the courtroom, was — had to do with this juror's wife. That outburst had been effectively completed by Mr. Mack at the time of his ejection. So that issue, I would submit, was really a done deal at that point. It was over and — Yeah, he got the juror removed. I'm sorry? He got the juror removed. He got the juror removed. And then he told or attempted to tell the jury something about the circumstances of the juror's removal. And the — Well, there were no done deals with him. Lord knows what he was going to do next. You know that. Well, that's true. Who can possibly tell? I mean, nothing he would — nothing he would agree to would he follow? I mean, there was no telling what he would have done if you let him go on. Right? He could have done several things. He was in a — he was in a pervy position, the Supreme Court's talked about, where it said you can remove the guy and put consul in his place and say, sorry, you know, you're such a jerk, you can't be a pro se. That's all. I would agree. I mean, we'll put somebody in your place whether you like it or not. That's fine. The judge certainly — that's one of the alternatives that I would submit that the judge could have done, is to just say, fine, you're — you're being removed, but we're bringing in an attorney to handle the rest of the case. That's one alternative. Another alternative is the judge could simply say, okay, Mr. Mack, we're going to, for instance, bind you, you know, shackle you so you can't do any more handwritten notes to the jury. And you can have — you can have 10 minutes. You can say whatever you're going to say, and I'll caution the jury. It didn't take him long to — but it didn't take him long to cross the line. I think — I mean, the district — you have to sympathize with the district court here. The district court was at its wits' end, really. I — you know, I totally sympathize with the district court. And I see this — anybody who's a parent, as I am, has probably been in a similar situation, where your buttons have been pushed and pushed and pushed, and finally you say something or do something that, in retrospect, you think, well, that's not really me. And you hope — and you hope that the Department of Public Social Services doesn't hear about it. You hope — well, you hope you don't cross the line quite that far. But I've submitted to this — When it — when it — he started attacking the jurors that — and threatening them, then maybe it was time to do something else, too. It wasn't necessarily pushing the buttons and overreacting. But I think most judges, when they — when they suspect jury tampering, get pretty upset for good reasons and want to take steps to protect the jurors. It's not necessarily an overreaction. It may have consequences, I suppose, legally. But certainly, the district court was in a very difficult situation. I would certainly concede that. And as I said, I sympathize with the district court. And if the — it was a no-win situation. If he replaced the lawyer at that point, then you have another appellate issue. At that point — What lawyer is going to come in and give a closing argument on five minutes' notice, or an hour's notice, or even a day or two notice? It's just not going to — it's, you know — That's not going to happen. It's going to be a mistrial. That's the only other — the only other remedy he had at that point, which was probably the goal from the beginning, or one of the goals. So it's a pretty difficult — I would agree that there probably should have been a mistrial. One of the things that I was starting to say that the judge could have done is, even knowing that Mr. Mack or suspecting that Mr. Mack might have something else improper to say, simply say, I'm going to restrict your closing argument. I'm only going to give you a limited time. You can say something. You know, I'm probably going to instruct the jury that most of what you said should be disregarded once you say it. But here, you can sit down and — shackled or whatever, you can say it. There were things the judge could have done that were short of simply calling an end to the trial and saying, okay, we're going to just stop this trial right now and send it out to the jury in what was essentially in the middle of the trial. And whether Mr. Mack — I think Your Honor is suggesting that Mr. Mack was trying to get a mistrial. I don't know if Mr. Mack was that sophisticated that he was trying to do that. I think he was — He was trying to make trouble, trying to stop the proceedings or do something. Perhaps trying to make trouble. But whether his thought process went as far as thinking this would be a mistrial, maybe so. That might be inconvenient and inefficient to have a mistrial at that point, but I'd submit that that's — that was really the judge's probably principal alternative, not the only one, but the principal alternative at that point. Do you want to save a little time for rebuttal? Yes, I do. Okay. Thank you. And, Kathy, will you correct? It's M-I-T-C-H-E-L. I think there's a T missing in his first name. Thank you. Counsel? Good morning, Your Honors. Mark Inseong for the United States. Certainly, this is not the trial that we or anyone else envisions when we think of what or how our judicial system is supposed to work. What's your best case that says that what Judge Prode did was okay? The best case is the — it was Judge Hunt. Judge Prode did the sentencing after Judge Hunt recused himself after this had all occurred. Illinois v. Allen is the best case that we can cite. There is no case that I know of that has the same set of circumstances. Do you know of any case at all where this kind of circumstance has happened, it's been upheld? There is a California case where it was reversed, where this kind of thing happened. I don't, Your Honor, and — which is why we emphasize the Illinois v. Allen case, which although it was not, at least in the end, a pro se defendant, it was a defendant that had a standby attorney who came in. I think the gist of that case was that when behavior by a defendant becomes so disruptive, so disrespectful, and as was pointed out earlier, becomes to the point where at least one of the jurors feels threatened by it, at that point, all bets are off, and that defendant at that point loses certain rights, which — All bets may be off, but the Constitution is not. Well, forgive my — It stays on in the face of nasty, disruptive, disrespectful, even idiotic people. It's still there. The Constitution stays on, but as was pointed out, the judge really had — he was in a catch-22 here. He had no other reasonable course of action to make. That's not right, is it? I think it is, Your Honor. The proponent has suggested they — he could have shackled him to the chair and said, you've got five minutes to argue, say what you want. I think the transcript makes absolutely clear that that would have not dissuaded Mr. Mack in any way, shape, or form. There was nothing that had been done along the way. He was warned numerous, numerous times. He was held in contempt. He was said, you're going to be removed if this continues. Nothing that was said or threatened to Mr. Mack dissuaded him at all. At one point, he even mocked Judge Hunt by saying, you're going to hold me in contempt? Do you think that means anything to me? I've been locked up for X amount of time, another 30 days, another two years. It doesn't mean anything to me. Did you ever see the movie 12 Angry Men? I have. I have. There's that wonderful scene in the restroom where one of the jurors is complaining about Henry Fonda. Can you believe that guy was baiting me out? And now he was baiting me, and Henry Fonda says, sounds like you did a pretty good job. Well, as I said, I agree what was brought up earlier. I think the judge had the tolerance where if it had remained just between he and Mr. Mack, this friction that had developed, he would have continued. But the point where this juror was threatened and was shown the note where somehow Mr. Mack had found out that this juror's wife was in the courtroom and prompted the juror himself to send a note to the judge saying, I feel threatened by that note. At that point is where the judge had to step in. But that's not where he stepped in. He said, don't tell the rest of the jury about it in the first place. But in the second place, the Supreme Court when it said, you know, what do you do when you've got one of these crazy people trying to defend himself? And they said, what you do is you appoint standby counsel or you do something. But never is the Supreme Court or any other court I know of said, what you can do is appoint a standby counsel, basically. Well, there is a case. Spell for anybody else. I don't know of no case either, but I certainly can't speak from anything other than my own personal experience. But I don't know if there's ever been a case where a defendant has fired three different attorneys, was then allowed to represent himself, was then offered standby counsel at that point, said, no, I don't want it unless I can name this specific attorney who I want who is not a panel attorney and who is not going to be given that choice anyway. All those things that led up to it. You have to look at this whole case from the inception, from the time the first attorney was fired. Well, people in Pennsylvania, you say people in hell want high water, you know. What does it make what he wants? If he's a problem, what keeps the judge from appointing standby counsel, whether he likes it or not? Well, then, and that was the catch 22 that I referred to. Then you're going to have a Faretta appeal. There's no problem appointing standby counsel. Well, that's not a Faretta problem. I mean, you can't have a Faretta problem if all you have is standby or advisory. You could, if you had advisory counsel, let him take over. But it's not a Faretta problem if you have standby counsel. And he just sits there until the guy behaves so badly that you have to take him away from his own, that you have to stop his own representation. At which point, you still don't have a Faretta problem, do you? You might have an appeal, but, you know, people can claim anything. Well, the first thing I want to address is, even before we get to the Faretta issues, there's nothing that Judge Hunt could have seen that would have triggered or signaled that this was going to happen. He knew that Mr. Mack had a problem getting along with his attorneys. There's no doubt about that. But that doesn't mean that that's an automatic equation so that he's going to be disruptive and disrespectful and completely out of line during the trial. I mean, there was no pre-signal of that. So to say that Mr. Hunt was not going to get along with his attorneys at all, he didn't act up in court whatsoever. You know, I'm not sure where we are in your time, because the clock didn't start when you first started arguing. But I think we understand your position. Okay. Thank you. I believe the brief was quite fine. And why don't we hear from Mr. Cohen and Mr. Simon-Rubato. Thank you. Thank you for coming in today. Obviously, the main distinction I'm going to make with the Illinois v. Allen case is that that is one of the cases that did involve an attorney remaining in the courtroom. And that, I submit, is the crucial distinction that we have here, that as long as there's an attorney in the courtroom, then the trial goes on. I'd agree, there can be standby counsel. I don't think it creates any kind of threat issue. I think the judge had the discretion to appoint it. He had the indications that something of that sort would be necessary. I'm not here to blame the judge. The point is not whether the judge did something wrong in terms of blame. The point is, was there a proper constitutional trial here? I take it if we do send it back, you're going to represent Mr. Mack? If I don't go the way of all the others. Thank you for your argument. Thanks for coming in today. This last case just argued will be submitted for decision. And that completes the Court's calendar for the week. We're adjourned. All rise.
judges: Fernandez, Hawkins, Thomas